[Civ. No. 4277.  First Appellate District, Division One.—July 3, 1922.]

In the Matter of the Estate of S. H. CHEDA, Deceased. GEORGE A. CHEDA, etc., Appellant, v. V. J. B. CHEDA, etc., et al., Respondents.

[1] OPTION—PURCHASE OF BANK STOCK—ACCEPTANCE OF PAYMENT ON PRICE—EFFECT OF.—Under a written option to purchase bank stock at any time within ten years which provided that if default be made in the payment of interest on the designated purchase price for the period of one year, the option might be terminated by paying to the optionee any sum paid on account of the principal, the acceptance of a payment on the principal sum had the effect of closing the option and converting it into an accepted offer.

[2] ID.—FORFEITURE FOR DEFAULT—RETURN OF PAYMENT—ESSENTIAL ELEMENT.—Such option, under such circumstances, was not subject to forfeiture after the death of the person giving the option for a default in the payment of interest for more than one year without offering to return the payment on the purchase price.

[3] ID.—EXTENSIONS—WAIVER—NOTICE.—Where the person giving such option granted delays in the payment of interest, it was incumbent upon him and after his death upon his representatives to give notice that they would thereafter require prompt payment of interest before resorting to the remedy of forfeiture.

[4] SPECIFIC PERFORMANCE—CONTRACT—ADEQUACY OF CONSIDERATION. Equity does not require the highest price obtainable for bank stock in order to enforce specific performance of a contract for its purchase, but merely that the price be fair and adequate under the circumstances.

APPEAL from an order of the Superior Court of Marin County directing performance of a written contract by an executor. Percy S. King, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

Henry E. Greer and Thos. P. Boyd for Appellant.

Jos. K. Hawkins and Roy C. Lewis for Respondents.

PREWETT, J., *pro tem.*—This is an appeal from an order of the trial court directing said executors to carry

1. Specific performance of optional contracts, notes, 118 **Am. St. Rep.** 592; 1 Ann. Cas. 990; 12 Ann. Cas. 90; Ann. Cas. 1913A, 362.

into execution the terms of a written contract entered into by said S. H. Cheda in his lifetime with said Elenore A. Cheda. The facts of the controversy are numerous, but in the main they are established by evidence that is free from contradiction.

More than twenty years ago S. H. Cheda organized the Marin County Bank and the Marin County Savings Bank. The two institutions have been affiliated ever since their organization and have been conducted in the same place of business and under the same management. S. H. Cheda had been for many years the president and active manager of both banks.

A few years after the organization of the banks S. H. Cheda gave to his brother, said V. J. B. Cheda, 95 shares of the capital stock in each of said two banks. V. J. B. Cheda held and owned this stock for more than fifteen years and up to October 30, 1916. On this date he was indebted to said S. H. Cheda on a promissory note in the sum of $19,000 and in addition thereto the latter claimed a balance as due to him from said V. J. B. Cheda of $6,650, alleged to be due on account of certain losses incurred in a barley deal and other matters, aggregating an entire claim of $25,650. On said October 30th said V. J. B. Cheda assigned to S. H. Cheda, in full payment of said sum of $25,650, all his said bank stock, to wit, 190 shares. The parties appraised this stock as worth, and the evidence shows that it was in fact worth, at least said sum for the payment of which it was assigned. The immediate motive for this assignment at this time is not clearly shown in the record, but on the following day, October 31st, there came on for trial a suit brought against said V. J. B. Cheda by some third person.

On January 9, 1917, more than two months after the assignment, S. H. Cheda, without consideration, executed to Mrs. Elenore A. Cheda, the wife of said V. J. B. Cheda, a written option to purchase this bank stock. About this document revolve most of the facts of this controversy. It is in the words and figures following:

"In consideration of the sum of one dollar and other valuable consideration, the receipt whereof is hereby acknowledged, I hereby give to Elenore A. Cheda, her heirs and assigns, the option of buying for the full price of

$25,650.00, together with interest thereon at the rate of six per cent per annum, interest payable quarterly, and if not so paid, then to be added to the principal sum of $25,650.00 and bear interest at the same rate, the following stock, to wit: 95 shares of the stock of the Marin County National Bank of San Rafael; 95 shares of the stock of the Marin County Savings Bank.

"The said Elenore A. Cheda shall have the right to close this application at any time within ten years.

"If default be made in the payment of interest for the period of one year at the option of the undersigned, this option may be terminated by paying to Elenore Cheda any sum paid on account of above principal sum of $25,650 and I agree to deliver to Elenore Cheda or to any one named by her, certificates in due form for the above described stock.

"Dated San Rafael, California, Jan. 9th 1917.

"S. H. CHEDA.

"Original.

"Signed in triplicate."

V. J. B. Cheda objected to being charged with said sum of $6,650 on the barley transactions, claiming that the investments were entered into without his consent or approval and that he should not be held liable therefor. Thereupon, and on the following day, S. H. Cheda agreed to "wipe out" this amount. He did not return it in cash, but he credited it, with the consent of V. J. B. Cheda, as a cash payment on said option. This payment was evidenced by a written receipt subscribed by said S. H. Cheda. It is an important factor in the case and we quote it, as follows:

"6,650.00.                    San Rafael, Cal. 1/10 1917.

"Received of Elenore A. Cheda six thousand six hundred and fifty dollars on a/c/ of option to purchase stock of bank dated Jan 9 1917.

"S. H. CHEDA.

"Original."

If, as we have stated, the stock was worth the amount due on the promissory note, to wit, $19,000, plus the amount of $6,650 involved in the barley deal, it follows that V. J. B. Cheda actually paid to S. H. Cheda, by transfer of the stock, the equivalent of the full sum of $26,650

in cash. Thereupon the latter, when he consented to "wipe out" the claim against the former on the barley deal, actually held $6,650 to his credit; and it was turned over as a cash payment in that sum on the option.

This is according to the findings and they are fully sustained by the evidence. There is, in fact, no evidence to the contrary.

It results, then, that this court must accept as a fact in the case that this payment of $6,650 was made on the option on the day following its execution. The payment thus made was, beyond question, the equivalent of so much cash.

On the sixteenth day of July, 1920, S. H. Cheda died, leaving a last will wherein he appointed said V. J. B. Cheda and another brother, George A. Cheda, as joint executors thereof. He left one minor son as his sole heir. For a period of about eighteen months prior to his death he was practically incapable of attending to business. During this period V. J. B. Cheda, assisted more or less by George A. Cheda, handled his affairs and managed the two banks. V. J. B. Cheda had control of the bank account of the deceased during his illness and made deposits therein and drew checks thereon as occasion required. Sometimes he signed simply the name S. H. Cheda and at other times he followed the signature with his own initials.

About the time of the payment of the $6,650 on the option contract, S. H. Cheda orally agreed that the dividends accruing upon the bank stock should regularly be credited to Elenore A. Cheda on the interest account on the option. The dividends on the stock more than paid the interest on the option and the excess was paid, from time to time, to Elenore A. Cheda. These dividends, up to and including the month of January, 1918, were, by S. H. Cheda, in his own handwriting, credited in liquidation of the interest accruing on the option. These credits paid the interest to the month of January, 1918. Shortly after this he suffered a collapse and he did not thereafter personally attend to any business.

In the month of May, 1919, there had accrued as unpaid dividends on said 190 shares of stock the sum of $855, which sum was, by said George A. Cheda, credited on the interest account on said option. This credit was made by him in his own handwriting and as agent for S. H. Cheda.

On or about the second day of July, 1920, and very shortly before the death of S. H. Cheda, said George A. Cheda received the sum of $855 as dividends upon said stock and he then and there paid the same into the bank account of S. H. Cheda, although no entry or indorsement was made upon said option contract to show that the same, or any part thereof, was applied toward the payment of interest. If Elenore A. Cheda was entitled to have it so credited, then she was not delinquent as much as one year in the payment of interest and no delinquency on account of nonpayment of interest ever accrued.

On September 3, 1920, George A. Cheda, acting as one of said executors, served upon *V. J. B. Cheda* a notice of forfeiture on the alleged ground that a payment of interest was more than one year overdue. No notice was ever served upon Elenore A. Cheda. The service was made upon her husband on the theory that a certain indorsement upon one of the triplicate copies of the option operated as a transfer thereof to him. This indorsement was made upon that copy retained by S. H. Cheda and it was found among his papers after his death. It was in the following words:

"For value received, I hereby sell, assign and transfer all my right in and to above option to V. J. B. Cheda.

"ELENORE A. CHEDA."

The evidence shows, without conflict, that V. J. B. Cheda had no knowledge of the execution of said assignment and that it was never delivered to him.

The dividends accruing on the stock in January, 1920, although actually paid into the bank to the credit of S. H. Cheda, were drawn out of the account by V. J. B. Cheda and apparently applied to his own use.

No offer was made at the time of service of the notice of forfeiture, or at any other time, to repay to Elenore A. Cheda, or to V. J. B. Cheda, the said sum of $6,650, paid on the option on January 10, 1917.

On the day following the service of said notice, Elenore A. Cheda paid to V. J. B. Cheda, as one of said executors, the sum of $1,400 by way of interest and in about one week thereafter she paid to him the entire balance of $19,000. These payments were accepted by V. J. B. Cheda, but not by George A. Cheda; and a few days thereafter

the full amount of both payments was deposited in one of the banks to the credit of the two executors and notice thereof given to George A. Cheda.

[1] The first and most important question in the case is the effect of the payment of $6,650 made on the option on the day following its execution. It should be remarked that, although V. J. B. Cheda strenuously insisted that he was not liable for and should not be bound by the transactions which resulted in the losses on the barley and other deals, he is made to say on cross-examination as a witness that he "owed" said sum to S. H. Cheda; but an examination of his entire testimony shows clearly that he disputed and controverted the claim and shows that his brother S. H. Cheda acquiesced therein and returned the money by way of credit on the option.

The effect of this payment was to close the option and to convert it into an accepted offer. From that time, the contract was fully binding upon S. H. Cheda. In the late case of *Flickinger* v. *Heck*, decided by the supreme court on September 17, 1921, and reported in 187 Cal. 111 [200 Pac. 1045], the court says: "An option contract may be regarded as embodying an offer. When the optionee, or person to whom the option is made, signifies his desire to accept, in accordance with the terms of the option, the optioner, or person making the offer, becomes obligated to perform. This acceptance of the offer contained in the option contract is called 'Election,' and it gives rise to a subsequent contract between the parties to buy and sell or perform whatever acts have been specified in the option contract."

The payment of part of the purchase price and its voluntary acceptance by S. H. Cheda constituted an election by Elenore A. Cheda to buy the stock. This is so, even if it be conceded that S. H. Cheda might have refused to accept less than the entire contract price. But, in fact, it was contemplated by the parties that payments less than the whole amount might be made on the principal. This is conclusively shown by the provision in the option that no forfeiture could be declared without first returning such portions of the principal as may theretofore have been paid. Its language is:

"This option may be terminated by paying to Elenore A. Cheda any sum paid on account of above principal of $25,650."

[2] When George A. Cheda on September 3, 1920, attempted to declare a forfeiture, he failed of his purpose, since he made no offer to return said payment. His position is that the death of S. H. Cheda revoked the option. It is quite true that the death of a party before acceptance revokes a mere option. (Sec. 1587, Civ. Code.) But we have no such case here. It is evident that both parties, after the payment of said sum of $6,650, regarded the option as closed. S. H. Cheda constantly recognized the obvious fact that an acceptance of the offer and the payment of a part of the purchase price converted the option into a mutual contract and that thereupon she became the owner of the stock and entitled to its dividends. This being so, the receipt by S. H. Cheda of the dividends constituted by operation of law a setoff to the accruing demands for interest. As long as he lived, unless the dividends of January and July, 1920, should constitute exceptions, they were regularly credited upon the interest. At most, the defenses interposed by appellant are purely technical and they are clearly at variance with the desires and intent of the contracting parties.

Although the option expressly provided that there could be no forfeit for nonpayment of interest unless all payments of principal were returned, the appellant made an effort to avoid the effect of this provision by inviting V. J. B. Cheda to file a claim against the estate of S. H. Cheda for any sum that might be due to him under the terms of the option. But this was not according to the terms of the option. Moreover, neither V. J. B. Cheda nor his wife had any claim against the estate. They could have had no claim upon the $6,650 until there had first been a lawful termination of the contract, and this event could be brought about only by returning the payment to him or her.

[3] It is insisted by the respondent that the delays granted in his lifetime by S. H. Cheda made it incumbent upon his representatives to give notice that they would thereafter require prompt payment of the interest before

resorting to the remedy of forfeiture. This claim is well founded. (*Stevinson* v. *Joy*, 164 Cal. 279 [128 Pac. 751].)

The executors waived the delay in making prompt payment. George A. Cheda, when V. J. B. Cheda asked that he figure up the amount necessary to pay the full purchase price, pleaded his desire to go on a vacation and suggested that to take it up then would interfere with his vacation. The matter was delayed until his return. This lulled the payee into a sense of security and operated to extend the time until a reasonable time after his return.

The respondent insists that the payments to V. J. B. Cheda and their acceptance by him as an executor cured any default theretofore existing. This view receives the support of our supreme court in *Willis* v. *Farley*, 24 Cal. 491, and *In re Sanderson*, 74 Cal. 199 [15 Pac. 753], but in view of our conclusions on other points it becomes unnecessary to examine the question at length.

The appellant submits the claim that the value of the stock at the time of the execution of the option, and especially at the time of the commencement of this proceeding, was so far in excess of the agreed price that it would be inequitable to order a specific performance of the contract. This position is wholly untenable. As to the value at the time of making payment of the $6,650, the point is not fairly open to discussion. S. H. Cheda was a man of affairs and evidently a banker of wide experience. He, better than any other person, knew the value of the stock. He knew when he accepted the payment of $6,650 whether or not he was asking a proper price for the stock. The supreme court, in *Estate of Cheda*, 187 Cal. 322 [202 Pac. 133], has held that this proceeding is practically a proceeding in equity terminating in a final judgment; the findings of the trial court are therefore conclusive on the court on appeal if reasonably sustained by competent evidence. In this case, the trial court found that the allegation of equity in the petition is true. This finding is justified by the testimony of V. J. B. Cheda when he testified that each and every allegation of the petition is true. It is sustained by other evidence that goes more into detail. In every view, the value is not so out of proportion to the agreed price as to justify a court in overriding the deliberate contract of the parties. **[4]** Equity

does not require the highest price obtainable, but merely that it should be fair and adequate under the circumstances. (*Haddock* v. *Knapp*, 171 Cal. 59 [151 Pac. 1140].) We are unable to say that the finding of the trial court on this point is not sustained by ample evidence. We may add that the option was closed within about two months after S. H. Cheda bought the stock and at the precise price that he paid for it.

Lastly, our attention is directed to that provision of the Probate Act which directs the trial court, if the right of the petitioner is found to be doubtful, to dismiss the petition without prejudice. (Sec. 1602, Code Civ. Proc.) However, we discover no particular wherein her right may be deemed doubtful, as viewed in the light of the findings and evidence. It does not appear that any point has arisen that could be handled more satisfactorily by a court of equity than by the probate court.

The order appealed from is affirmed.

Tyler, P. J., and Richards, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 31, 1922.

All the Justices present concurred.

Richards, J., *pro tem.*, and Myers, J., *pro tem.*, were acting.